**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRICE CHOPPER, INC.,<br><br>   Plaintiff,<br><br>  v.<br><br>CONSOLIDATED BEVERAGES, LLC,<br><br>   Defendant. | )<br>)<br>)<br>)  Civil No.<br>)  09-10617-FDS<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM AND ORDER ON THE PARTIES'**
**CROSS MOTIONS FOR SUMMARY JUDGMENT**

   This is a contract dispute between a supermarket chain and a distributor of alcoholic beverages. Plaintiff Price Chopper, Inc., has brought suit against defendant Consolidated Beverages, LLC, for the unpaid value of beverage containers redeemed at three Price Chopper supermarket locations. Consolidated has filed counterclaims seeking the value of the scrap metal from those containers. The parties base their respective damages claims on theories of breach of contract, *quantum meruit*, and unfair business practices under Mass Gen. Laws ch. 93A. Jurisdiction is based on diversity of citizenship.

   Price Chopper and Consolidated have separately moved for summary judgment. For the reasons set forth below, the parties' motions for summary judgment will each be granted in part and denied in part.

**I.  Background**

   The undisputed material facts are as follows.

   Plaintiff Price Chopper, Inc. is a New York corporation with its principal place of business

in New York. (Pl. Facts ¶ 1).[1]  It operates retail supermarkets throughout the state of

Massachusetts, including two stores in Worcester and one in Webster.  These three stores are the

focus of the present case.  The stores feature reverse vending machines ("RVMs") that allow

customers to turn in empty beverage containers in exchange for a refund of 5 cents per container.

Defendant Consolidated Beverages, LLC, is a Massachusetts limited liability company

with its principal place of business in Auburn, Massachusetts.[2]  It is the exclusive distributor of

Anheuser-Busch alcoholic beverage products in central Massachusetts.  Since 1995, customers

have used Price Chopper RVMs at the three locations to turn in Consolidated containers.

### A.    The Bottle and Can Redemption System

Container redemptions in Massachusetts are governed by Mass. Gen. Laws ch. 94, §§

321-327 (the "Bottle Bill").  Under the Bottle Bill, consumers pay a deposit when they purchase

certain canned or bottled beverages in Massachusetts, which is then refunded when the empty

container is returned.[3]  Returns must occur at one of two types of authorized locations:

"redemption centers" or "dealers."  Mass. Gen. Laws ch. 94, §§ 321, 323.  A redemption center

must apply to the state for authorization to accept particular types of containers and, if approved,

must accept all qualifying containers.  A dealer, on the other hand, is obliged to accept containers,

---

[1] Price Chopper is wholly owned by Golub Corporation, which also has its principal place of business in New York.  Plaintiff will be referred to as "Price Chopper" in this order unless specifically quoting from the record.

[2] In 2005, Consolidated was sold and reorganized as an LLC.  (Fields Dep. at 7, 13).  Prior to that, it had been incorporated as a corporation.  For the purposes of this order, the Court will use "Consolidated" to refer to both the pre-2005 and the post-2005 entity.

[3] The Bottle Bill specifically applies to "soda water or similar carbonated soft drinks, mineral water, and beer and other malt beverages", but not to other alcoholic beverages, milk, or fruit juice.  Mass Gen. Laws ch. 94, § 321.

but only of the type, size, and brand sold by that dealer. After paying out refunds on returned containers, the redemption center or dealer can seek reimbursement from distributors for each container's refund value, plus a handling fee. § 323(c), (e). Under the Bottle Bill, a distributor must reimburse a redemption center for any container of a type, size, and brand sold by that distributor in the Commonwealth. § 323(e). The distributor must reimburse a dealer, on the other hand, only if it actually sells containers of the same type, size, and brand to that dealer. § 323(c). The distributor owns the returned containers and bears the cost of transporting them from authorized locations.

The Bottle Bill expressly outlaws any attempt to redeem large numbers of out-of-state containers and provides that "the attorney general and district attorneys shall enforce [its] provisions." §§ 323(i), 327. There is no private right of action to enforce the statute. *All Brands Container Recovery, Inc. v. Merrimack Valley Distrib. Co.*, 54 Mass. App. Ct. 297, 303 (2002).

### B.    The Beginning of the Relationship (1995)

#### 1.    Container Refunds

In 1995, Price Chopper installed RVMs at the three locations to facilitate customer redemption of empty containers. When a consumer places a container into an RVM, the machine reads a bar code on the container, which provides it with information on the brand and container type, but not the state of origin. If the brand and bottle type are accepted at that location, the RVM accepts the container and issues a 5-cent voucher. The container is then crushed into "scrap" and sorted by material. Price Chopper relies on the bar code information to determine which regional distributor is responsible for that container. (Pl. Facts ¶ 8).

Around the same time that it installed the RVMs, Price Chopper applied for and received "redemption center" status for its Massachusetts locations. Price Chopper also sought and received signed authorization from Consolidated to begin redeeming Anheuser-Busch products using its RVMs. (*See* Fields Dep. at 89-90; Pl. Facts ¶ 12).[4] It began billing Consolidated for refunds on Anheuser-Busch products redeemed at the three locations, charging 5 cents, a 2.25-cent handling fee, and a non-statutory processing fee of 0.003 cents for each container refunded. (Pl. Facts ¶¶ 16-17). Consolidated paid these bills.[5]

## 2.    Scrap Metal Sales

Price Chopper also created a system for combining metal and plastic from crushed containers and selling the scrap on the commodities market. (Pl. Facts ¶ 10). It sent letters to various distributors in 1995, including Consolidated, offering to serve as their "back haul" agent for this purpose. (Persons Dep. at 24).[6] In the letters, Price Chopper asked distributors to designate an agent to pick up the scrap from their returned containers; if they did not reply, Price Chopper stated that it would act as their agent in transporting and selling the scrap. (*Id.*). When Consolidated did not respond to the letter, Price Chopper began selling Consolidated scrap and issuing a monthly check for the scrap value, which Consolidated cashed.

## C.    The Relationship from 1995 to 2001

From 1995 to 2001, Price Chopper continued to redeem Consolidated containers at the

---

[4] According to Consolidated, it signed an authorization for each type of beverage container. (Fields Dep. at 89). Neither party has provided the signed form or an example of such a form.

[5] There appears to be a factual dispute about whether Consolidated paid the non-statutory processing fee. Consolidated contends that it never paid such a fee. (Def. Facts ¶ 7). Price Chopper contends that Consolidated did pay, at least initially. (Pl. Facts ¶¶ 15-16).

[6] Neither party has provided a copy of this letter.

three locations and to serve as Consolidated's back haul agent. Consolidated reimbursed Price

Chopper for container refunds and paid the handling fee. Price Chopper regularly sent checks for

the sale of scrap, which Consolidated cashed.

In late 1996, Price Chopper let its "redemption center" status lapse. (*See* Def. Mot.

Summ. J. Ex. 13). There is evidence that both Price Chopper and Consolidated remained

unaware of this change.

On December 19, 1997, Consolidated sent a letter to Price Chopper expressing concerns

about high redemption rates and the accuracy of Price Chopper's bills. (*Id.* Ex. 8).[7]

## D.    The Relationship Breaks Down (2001-2003)

Reacting to what it saw as excessively high redemption rates at the three locations,[8]

Consolidated stopped all payment for redemptions at those locations in August 2001. (*Id.* Exs.

10, 11). In response, Price Chopper stopped sending scrap value checks to Consolidated. (*See*

*id.* Ex. 15).

Following a series of letters discussing the issue of stopped payments, Price Chopper's

counsel wrote to Consolidated on April 18, 2003, to demand payment of its invoices. (*Id.* Ex.

---

[7] To track refunds to various dealers and distributors under this system, Consolidated uses a measurement known as the "redemption rate." This is the ratio of the number of containers redeemed at a particular location over the number of containers sold to that location. (Fields Dep. at 102-03). For example, if Consolidated sold 100 cans to a dealer and redeemed 100 cans from that dealer in January, the redemption rate for cans at that location in that month would be 100%. If Consolidated again sold 100 cans in February but redeemed 200 cans, the redemption rate for cans in February would instead be 200%.

In the case of the three locations, Consolidated calculated "containers sold" using sales figures from the alcohol vendors leasing space there. (Fields Dep. at 103). Price Chopper disputes the use of redemption rate because it does not have access to sales figures for these alcohol vendors. (*See* Persons Aff. at 17, 26-27).

[8] Consolidated calculated a total redemption rate of 203.1% for cans and 561.5% for bottles at the three stores in 2000. (Def. Mot. Summ. J. Ex. 9). According to Consolidated, these high redemption rates result from people bringing containers illegally from Rhode Island to the three locations. (*See* Fields Dep. at 106). Price Chopper disputes this.

12).  As justification for the demand, the letter asserted that Price Chopper's Massachusetts locations were "licensed redemption center[s] under Chapter 94, Sections 321-327 of the Massachusetts General Laws."  (*Id.* Ex. 12).[9]  On April 24, 2003, Consolidated President David Fields wrote a letter to Price Chopper, which stated in relevant part:

> Unfortunately, your redemption rates at this location . . . are still extremely high . . . . As discussed in our conference call, these rates are unacceptable compared to our territory rate of 76% and our RVM rate of 95%.
>
> During the conference call an offer to pay up to 105% redemption on both past and future invoices was discussed.  As of today we have not received any further communication on this issue.  We are anxious to resolve this issue; therefore, I have included a check for all outstanding balances adjusted to the 105% redemption rate previously mentioned.

(*Id.* Ex. 6).  Consolidated included a check for the two years of missed payments, reduced to the 105% redemption rate.  Price Chopper cashed the check but did not respond to the letter.[10]

On April 17, 2009, Price Chopper filed this action in federal court on the basis of diversity jurisdiction.  Among other things, it asserts damages for breach of contract in the amount of $222,154.58.  Defendant filed its answer and counterclaims on May 20.

## II.    Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Essentially, Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing

---

[9] This was untrue.  (*See* Pl. Opp'n Facts ¶ 15; Def. Mot. Summ J. Ex. 13).

[10] Consolidated contends that no further discussion occurred.  Price Chopper's affiant, Diane Persons, appears to take inconsistent positions about whether it had further discussions with Consolidated following the April 24 letter.  (*Compare* Persons Dep. at 29-30 *with* Persons Aff. ¶ 19).

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se. Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered." *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir. 1996) (internal citations omitted).

## III.  Analysis

The complaint requests relief under theories of breach of contract and restitution (Pl. Counts 1 and 2), *quantum meruit* (Pl. Count 3), and unfair and deceptive business practices (Pl. Count 4). In its counterclaims, defendant requests relief under theories of breach of contract (Def. Count 1); *quantum meruit* (Def. Count 2); unfair and deceptive business practices (Def. Counts 3 and 4); abuse of process (Def. Count 5); and fraud (Def. Count 6).

Before examining the parties' dispositive motions, the Court will first address three preliminary issues:  first, whether Uniform Commercial Code would apply to any contractual relationship; second, whether there was a contractual relationship; and third, the role of the Bottle Bill, if any, in that relationship.

### A.  Preliminary Matters

### 1. The Applicability of the Uniform Commercial Code

The first issue is whether the Massachusetts version of Uniform Commercial Code ("UCC"), Mass. Gen. Laws ch. 106, §§ 2-101 *et seq.*, would govern a contract between the parties. The Court finds that it would not.

The provisions of the UCC modify the common law as applied to transactions in goods. Mass Gen. Laws ch. 106, § 2-102. "Goods" are "all things . . . which are movable at the time of identification to the contract for sale." § 2-105. Although beverage containers (and scrap produced from such containers) would constitute "goods," a close examination of the parties' relationship reveals that it was primarily an arrangement for services, and thus outside the scope of the UCC. The heart of the relationship concerned plaintiff's acceptance, processing, and sale of empty containers on behalf of defendant, who paid it a fee in compensation. No container or scrap was ever actually transferred from one party to the other. "Contracts whose predominant factor, thrust, or purpose is the rendition of services are not within the scope of [the Uniform Commercial Code]." *White v. Peabody Constr. Co.*, 386 Mass. 121, 132 (1982). To the extent there is a contract, therefore, it would not be governed by the UCC.

### 2. The Existence of a Contract

The next issue is whether a contract existed between the parties at the relevant time. Plaintiff contends that the parties "entered into a private, non-statutory agreement for the handling of returned [c]ontainers of Anheuser-Busch products at the [three] locations." (Compl. ¶ 13). In its answer to the complaint, defendant appears to contend that a contract was formed only in 2003, when it agreed to pay plaintiff for redemptions at a fixed 105% redemption rate. (Ans. ¶

13).[11]

The formation of a contract requires "a bargain in which there is manifestation of mutual assent to the exchange and a consideration." RESTATEMENT 2D CONTRACTS § 17. Such a contract may be "express or implied, in writing or oral." *Mass Cash Register v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 415 (D. Mass. 1995). "In the absence of an express agreement, an implied contract may be inferred from (1) the conduct of the parties and (2) the relationship of the parties." *T.F. v. B.L.*, 442 Mass. 522, 526-27 (2004) (citing *LiDonni, Inc. v. Hart*, 355 Mass. 580, 583 (1969)). "An implied contract requires proof that there was a benefit to the defendant, that the plaintiff expected the defendant to pay for that benefit, and that the defendant expected, or a reasonable person should have expected, that he or she would have to pay for that benefit." *Id.* at 527. Furthermore, whether or not the defendant was aware of the other party's expectations, the defendant's failure to object can create a contract if his or her objective actions manifest the existence of an agreement. *Id.*

There is no written contract in the record, nor has either party submitted any documentation related to their initial dealings. However, the undisputed facts point to the formation of a contract between the parties as early as 1995 or 1996, well before this dispute arose. First, it is undisputed that defendant authorized plaintiff to serve as its back haul agent in 1995. Second, it is undisputed that defendant signed forms authorizing plaintiff to redeem its containers at the three locations as early as 1995. Finally, and most importantly, the practices of the parties between 1995 and July 2001 clearly manifested mutual assent to enter into a

---

[11] Defendant has subsequently made statements to the opposite effect. (*See, e.g.*, Def. Opp'n at 3). Because it is not entirely clear whether defendant still disputes the formation of a contract prior to 2003, the Court addresses the question here.

contractual relationship. Plaintiff billed defendant for redemptions approximately every month, and defendant paid those bills. Defendant allowed plaintiff to sell its scrap on the commodities market and cashed the checks sent to it for those sales. Together, these actions manifested agreement to enter into a business relationship wherein plaintiff accepted, redeemed, and resold empty containers for defendant in exchange for reimbursement and a fee.

The Court therefore finds that the parties had entered into a contract prior to the time period at issue in this case.

### 3. The Role of the Bottle Bill

As described above, the Bottle Bill creates a statutory scheme for promoting the recycling of certain beverage containers in Massachusetts. Although the parties do not dispute that their activities were governed at least in part by the Bottle Bill, they disagree on what role those provisions played in their contractual relationship.

Defendant first contends that, as a matter of statutory law, the Bottle Bill removes any obligation under the contract to reimburse plaintiff for out-of-state containers. It points to § 323(i), which provides:

> (i) The obligations to accept or take empty beverage containers and to pay the refund value and handling fees for such containers as described in paragraphs (b), (c), (d) and (e) shall apply only to containers originally sold in the commonwealth as filled beverage containers. Any person who tenders to a dealer, distributor, redemption center or bottler more than ten cases of twenty-four empty beverage containers each, which he knows or has reason to know were not originally sold in the commonwealth as filled beverage containers, for the purpose of obtaining a refund value or handling fee, shall be subject to the enforcement action and civil penalties set forth in section three hundred and twenty-seven. For the purpose of this section and section three hundred and twenty-seven, the term person shall include any individual, partnership, corporation, or other combination or entity.

Mass. Gen. Laws ch. 94, § 323(i). Defendant is incorrect. Even if § 323 (i) does apply as a

statutory matter, the parties could not invoke it here because there is no private right of action to enforce the Bottle Bill. *See All Brands*, 54 Mass. App. Ct. at 303 (redemption center had no private right of action against distributor that refused to pay refund value).[12]

Nor would § 323(i) necessarily void a contract that required a distributor to accept both in-state and out-of-state containers. The statute does not outlaw acceptance of out-of-state containers *per se*; rather, it removes *the obligation* to accept them. A contract that required a distributor to accept all containers—even if some of them originated from outside the Commonwealth—is therefore not automatically barred by this language. For example, a distributor might contract with a dealer to reimburse it for all containers—even if there is a likelihood that some are from outside the Commonwealth—as a cheaper alternative to evaluating

---

[12] Plaintiff's and defendant's obligations under the Bottle Bill, in any case, would not have been governed by § 323(i) for most of the relevant time period. Between December 1996 (when plaintiff lost "redemption center" status) and May 2008 (when it regained that status), the parties' relationship was governed by § 323(b) and (c), which provide:

> (b) . . . [A] dealer shall accept from any person during his business hours any empty beverage container of the type, size and brand sold by the dealer within the past sixty days and shall pay that person the refund value of each beverage container returned.

> (c) . . . [A] distributor shall accept from any dealer any empty beverage container of the type, size and brand sold by the distributor within the past sixty days and shall pay the dealer the refund value of the beverage container plus a handling fee of at least one cent per container if the empty beverage container is presented at the time of and at the location at which the dealer obtains filled beverage containers from the distributor.

Mass. Gen. Laws ch. 94 § 323(b), (c). These provisions clearly create obligations only with regard to beverages actually sold by a dealer to the public. Because plaintiff did not sell defendant's products (they were sold by the independent alcohol dealers located at the three locations), it was not required by the Bottle Bill to redeem defendant's containers, nor was defendant required to reimburse plaintiff for them.

After plaintiff received "redemption center" status in May 2008, defendant would have been obliged to reimburse plaintiff for its containers under § 323(e) and would have been subject, by extension, to the provisions of § 323(i). *See* Mass. Gen. Laws ch 94, § 323 (e), (i).

each can on a case-by-case basis.[13]  The distributor could still comply with the statute by taking

measures to ensure that did not pass on the cost for out-of-state redemptions to other entities

further up the chain—by under-reporting its payouts, for example.  And the dealer could still sue

in breach of contract if the distributor failed to accept all of its containers.

Defendant next contends that the parties intended to incorporate a restriction on out-of-

state containers into the terms of their contract.  (Def. Mot. Summ. J. at 1) (asserting that the

parties had "an informal agreement that the provisions of the Bottle Bill would govern their

relationship.").  Plaintiff contends the opposite.  (Pl. Mot. Summ. J. at 13) (Although Bottle Bill

"guide[d] the dealings between the parties," those dealings are "squarely outside [its] scope.").

Again, nothing in the Bottle Bill prevents the parties from incorporating the same or

similar terms into their private dealings, and suing in contract for violations of those terms.[14]

Whether, however, such terms were part of the contract is a disputed question of fact.  *See Coll*,

50 F.3d at 1122 (stating that ambiguities in contract terms are issues of fact for the jury).  This

issue is therefore not properly resolved on summary judgment.

In summary, the Court finds that the provisions of the Bottle Bill related to out-of-state

containers are not controlling as a matter of law, and whether they were incorporated into the

contract is a question of fact for the jury.

Having resolved these preliminary issues, the Court now turns to the parties' respective

---

[13] In addition, the dealer would not necessarily be subject to § 323(i)'s other provisions, if it had no reason to think that it was tendering large numbers of out-of-state containers.

[14] The Court notes that a rule preventing such independent contracting would unduly restrict the parties' ability to meet their obligations under the statute.  For example, a distributor might contract with a subcontractor to handle the redemption aspect of its business.  Even if that contract incorporated some of the same performances required by the Bottle Bill—redeeming in-state containers, for example—the statute would not necessarily preclude either party from suing under the contract to enforce those obligations.

claims.

**B.    The Breach of Contract Claims (Pl. Counts 1 and 2; Def. Count 1)**

**1.    The Statute of Limitations**

The parties dispute whether all or part of the breach of contract claims is barred by the statute of limitations. For the reasons stated below, the contract at issue is a divisible contract, so payments that became due more than six years before the commencement of this action are time-barred.

The limitations period for breach of contract actions is six years. Mass Gen. Laws ch. 260 § 2. However, "[w]hen the [limitations period] for a breach of contract begins to run depends on whether the contract is entire or divisible." *Berezin v. Regency Sav. Bank*, 234 F.3d 68, 73 (1st Cir. 2000) (quoting *Flannery v. Flannery*, 429 Mass. 55, 58 (1999)). *In Bianchi Bros.*, the Supreme Judicial Court described the characteristics of a divisible contract:

> A contract may be entire in the sense that there is but one agreement covering all the terms and yet it may be that the performance under the contract will be divided into different groups, each set embracing performances which are the agreed exchange for each other, the result being that the contract is entire but divisible.

*Bianchi Bros., Inc. v. Gendron*, 292 Mass. 438, 445 (1935); *see Flannery*, 429 Mass. at 58 ("A divisible contract contemplates performance divided into differing parts, with separate consideration provided for each."); *Potter & McArthur, Inc. v. Boston*, 15 Mass. App. Ct. 454, 456 (1983) (applying rule to construction contract where payment was tied to completion of different phases); *Allan R. Hackel Org., Inc. v. American Radio Sys. Corps.*, 2000 WL 281689, at *2 (Mass. Super. Ct. Jan. 12, 2000) (divisible contract where contract was "not to be completed at one time, but over time and in separate parts").

Here, it is undisputed that plaintiff tracked and billed for redemptions in four-week increments, and that defendant paid those bills on a monthly basis. Plaintiff also sent defendant

scrap checks on a monthly basis.  In this context, each four-week period of redemption by plaintiff and corresponding payment by defendant constituted a separate performance.  This is so even though the terms of the contract are not express.  "The parties' actual performance, which has been over time, is a reliable indication that this [is a divisible] contract."  *Allan R. Hackel*, 2000 WL 281689, at *2; *see Berezin*, 234 F.3d at 73 (citing *Hackel* for that proposition).

When a contract is divisible, "we consider each alleged violation of the continuing [periodic] payment obligation a new claim for statute of limitation purposes, as with any contract calling for continuous separate performances over a period of time."  *Chambers v. Lemuel Shattuck Hosp.*, 41 Mass. App. Ct. 211, 213 (1996) (internal quotations omitted); *see Flannery*, 429 Mass. at 58.  Thus, the limitations period runs separately for each disputed payment. Because the complaint was filed on April 17, 2009, any disputed payment that was due before April 17, 2003, is barred by the statute of limitations, and summary judgment will be granted as to those payments.

Plaintiff contends that the limitations period for these disputed payments would have been tolled by defendant's payment in April 2003 of all prior disputed payments at a 105% redemption rate.  It cites *Boles v. Katz*, 340 Mass. 406, 408 (1960), for the rule that "[w]here a partial payment is made on account of an existing indebtedness, the whole debt upon which such payment is made is thereby taken out of the statute of limitations up to that time."  Plaintiff misreads the law in this regard.  A partial payment only functions to toll the limitations period where "[t]he payment is an acknowledgment of the existence of the indebtedness, and raises an implied promise at that time to pay the balance."  *Id.*  "[I]n order to have this effect the circumstances attending the part payment must be such as to support a fair and reasonable

inference that the debtor intended to renew his promise of payment." *Provident Inst. for Sav. v. Merrill*, 311 Mass. 168, 171 (1942).

No such fair and reasonable inference can be drawn here. The defendant's letter stated that it sought to "resolve this issue" by "includ[ing] a check for all outstanding balances adjusted to the 105% redemption rate." (Def. Mot. Summ. J. Ex. 6). There is no question that defendant intended its payment to be total, rather than partial; and that it saw plaintiff's acceptance of the check as a settlement of all outstanding debts. A payment in those circumstances cannot constitute an acknowledgment of the existence of the indebtedness, and thus cannot toll the limitations period. *See Materials Dev. Corp. v. Comm'r of Revenue*, 56 Mass. App. Ct. 593, 598 (2002) (taxpayer's payment of underlying tax while at same time denying any obligation to pay interest did not toll the limitations period as to the interest); *Provident*, 311 Mass. at 171 (payments on debt by an unrelated entity did not toll the limitations period as to the debtor).

## 2. The Payments after April 17, 2003

The Court considers the remaining payments under Massachusetts contract law. The elements of a breach of contract claim in Massachusetts are (1) the existence of a valid and binding agreement between the parties; (2) a breach of that agreement by the defendant; and (3) damages resulting from the breach. *Coll*, 50 F.3d at 1122. The interpretation of a contract is normally a question of law for the court. *Id.*; *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 516 (1970) . If a contract is ambiguous, however, the determination of what terms existed is a question of fact for the jury. *Coll*, 50 F.3d at 1122; *Trafton v. Custeau*, 338 Mass. 305, 307-08 (1959).

Here, the parties' breach of contract claims turn on the precise terms of the implied

contract. In particular, plaintiff's claims hinge on whether the contract incorporated provisions of the Bottle Bill. Because this is a disputed question of fact, summary judgment is not appropriate.[15]

The same holds true for defendant's theories that its April 2003 letter constituted a valid modification or substitution of the existing contract. "Whether the parties agreed to modify their existing contract [is] a question of fact for the [jury]." *Emerald Excavating Co. v. Amelia*, 1998 WL 146694, at *2 (Mass. App. Ct. Mar. 24, 1998); *see L. W. Severance & Sons, Inc. v. Angley*, 332 Mass. 432, 438 (1955); *see also Shea v. Goldstein (In re Goldstein)*, 234 B.R. 214, 223 (Bankr. D. Mass. 1999) (whether parties intended substitution of previous contract is a question of fact). Where, as here, there is a factual dispute concerning the nature and extent of communications that took place after the April 2003 letter, summary judgment is again not appropriate.[16]

### C. The *Quantum Meruit* Claims (Pl. Count 3; Def. Count 2)

The unjust enrichment claims depend on the outcome of the breach of contract claims. *See Boswell v. Zephyr Lines, Inc.*, 414 Mass. 241, 250 (1993) (where a valid contract covers the subject matter of the dispute, law need not create a *quantum meruit* right). As a result, summary judgment is not appropriate as to these claims.

### D. The Chapter 93A Claims (Pl. Count 4; Def. Counts 3 and 4)

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or

---

[15] The Court notes that whether large numbers of out-of-state cans were being redeemed at the three locations is also a disputed question of fact.

[16] This reasoning applies equally to defendant's argument that there was an accord and satisfaction. *See Wong v. Paisner*, 14 Mass. App. Ct. 923 (1982) (whether there was an accord and satisfaction is a question of fact).

practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a);

*Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000).  For a

claim brought by a business plaintiff, § 11 authorizes private suit only where the plaintiff suffers

"any loss of money or property, real or personal" as a result.  Mass. Gen. Laws ch. 93A, § 11.[17]

Whether conduct is unfair or deceptive depends on the nature of the conduct and on its purpose

and effect.  *Incase, Inc. v. Timex Corp.*, 421 F. Supp. 2d 226, 239 (D. Mass. 2006), *aff'd*, 488

F.3d 46 (1st Cir. 2007).  A mere breach of contract cannot by itself violate ch. 93A.  *Id.*;

*Commercial Union Ins.*, 217 F.3d at 40; *see also Stonehill College v. Mass. Comm'n Against*

*Discrimination*, 441 Mass. 549, 582 (2004) (dictum) (describing category of cases "based on a

breach of contract, with some egregious circumstance surrounding that breach providing the

further ingredient of 'unfairness' to make out a [chapter 93A] claim").

### 1.      **Plaintiff's Chapter 93A Claim**

Plaintiff's principal argument is that defendant's refusal to pay the amount billed to it is a

"deliberate attempt" to "continue to obtain the full benefits of [plaintiff's] [c]ontainer redemption

and processing services while enabling [defendant] to effectively discount its payments for those

services."  (Pl. Mot. Summ. J. at 15).

"[A] party who breaches a contract in deliberate attempt to obtain the benefits of the

---

[17] Section 11 also states that "[n]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged . . . unfair or deceptive act or practice occurred primarily and substantially within the commonwealth."  It goes on to state that the burden is on the party seeking to establish that the challenged conduct did not occur primarily and substantially in Massachusetts. *Id.*  Therefore, establishing the location of the alleged unfair or deceptive conduct is not a jurisdictional prerequisite, but a defense to liability on which the defendant bears the burden of proof.  *See Clinton Hosp. Ass'n v. Corson Group, Inc.*, 907 F.2d 1260, 1263 (1st Cir. 1990); *Arthur D. Little Int'l v. Dooyang Corp.*, 979 F. Supp. 919, 925-26 (D. Mass. 1997).  The defense has not been not raised or proved; therefore, the Court need not determine the location of the challenged conduct.

contract, and to avoid fulfilling its own obligations under it, may have committed an unfair or deceptive act under chapter 93A." *Incase*, 421 F. Supp. 2d at 239 (collecting cases). Such a violation generally involves the use of the breach of contract as a lever or wedge to enhance a party's bargaining power or exact control over the other party. *See Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985). Put another way, those cases involve "commercial extortion or a similar degree of culpable conduct." *Commercial Union Ins.*, 217 F.3d at 40 (citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474-75 (1991)).

The undisputed facts of the present case, however, do not rise to that level. The record indicates that defendant notified plaintiff of its concerns as early as 1997 and engaged in extensive discussions with plaintiff about those concerns. In 2003, defendant tendered a check for its unpaid balances up to that point and framed the payment as an offer to resolve the dispute. That letter also clearly stated defendant's intent to pay 105% going forward. Unlike the cases where a chapter 93A violation has been found, defendant did not induce plaintiff to perform its part of the contract by making false promises that it would do something in return. *See, e.g.*, *Incase*, 421 F. Supp. 2d at 239 (violation where defendant used promises of a manufacturing contract to solicit design work from plaintiff while secretly giving contract to another company); *Commercial Union Ins.*, 217 F.3d at 40-41 (violation where reinsurer's pattern of "evasiveness and obstructionism" to avoid its contractual obligations included deliberately avoiding coming to a decision on whether to pay; constantly shifting its defenses and objections to payment; and allowing almost two and one-half years to elapse from receipt of proof of the reinsurance until trial); *Ecological Fibers, Inc. v. Kappa Graphic Bd., B.V.*, 345 F. Supp. 2d 13, 15-16 (D. Mass. 2004) (plaintiff stated 93A claim where defendant entered into an agreement and never intended to carry out the terms of the

agreement for the full five-year term, but rather entered into it for the purpose of obtaining information about and soliciting plaintiff's customers); *Anthony's Pier Four*, 411 Mass. at 475 (violation where owner withheld approval of development plan in an attempt to force developer to increase compensation to owner beyond what contract required).  There are also no other signs of the "bad faith" that is the hallmark of a chapter 93A violation.  Instead, defendant made clear that it intended to underpay for its redemptions, yet plaintiff continued to accept all of defendant's containers anyway.

Accordingly, summary judgment will be granted as to plaintiff's chapter 93A claim.

## 2. Defendant's Chapter 93A Claims

Defendant's principal theory turns on the statement by plaintiff's counsel that it was a "redemption center" under Massachusetts law at a time when it was not.  A false statement may constitute a "deceptive act" within the meaning of Mass. Gen. Laws ch. 93A, § 2(a) if the person making the statement did so intentionally.  *See Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 394 (2004) (false advertising by cigarette companies where record indicated their knowledge that advertising was false).  Defendant contends that plaintiff intended to intimidate it into complying with plaintiff's payment demands, while plaintiff contends that the statement was made under a mistaken belief that it had "redemption center" status at the time.

Whether the statement constituted a violation of chapter 93A turns, at least in part, on the question of intent.  This is a disputed question of fact that is not appropriate for resolution on summary judgment.  Accordingly, summary judgment will be denied insofar as defendant's claims relate to this statement.

Defendant also appears to argue that plaintiff violated chapter 93A by continuing to send

invoices for the full amount of its redemptions and by "attempting to invoice [defendant] for [c]ontainers it knew or should have known did not originate in [Massachusetts]." (Ans ¶¶ 8a, 9a). These theories must fail. Whether it was appropriate for plaintiff to continue to invoice defendant depends on the disputed terms of an implied contract. Where, as here, there is no evidence of bad faith, plaintiff's actions do not rise to the level of a chapter 93A violation. Summary judgment will therefore be granted insofar as defendant's claims relate to these theories.

### E. The Abuse of Process and Fraud Claims (Def. Counts 5 and 6)

Defendant waived these claims in its motion for summary judgment; accordingly, they will be dismissed.

## IV. Conclusion

For the foregoing reasons, summary judgment as to plaintiff's claims is:

1. GRANTED insofar as Counts 1, 2, and 3 relate to payments prior to April 17, 2003, and otherwise DENIED; and

2. GRANTED as to Count 4.

Summary judgment as to defendant's claims is:

1. GRANTED insofar as Counts 1 and 2 relate to payments prior to April 17, 2003, and otherwise DENIED;

2. DENIED insofar as Counts 3 and 4 relate to plaintiff's false statement and otherwise GRANTED; and

3. GRANTED as to Counts 5 and 6.

**So Ordered.**

_/s/ F. Dennis Saylor_

F. Dennis Saylor IV
United States District Judge

Dated: March 10, 2011